INTERSTATE COMMERCE COMMISSION
v. WOODALL FOOD PRODUCTS
CO., Inc.

Civ. A. 4439.

United States District Court
N. D. Georgia, Atlanta Division.

Feb. 20, 1953.

Leo H. Pou, Washington, D. C., and Gerald E. Jessup, Atlanta, Ga., for the plaintiff.

640

White, Douglas & Arnold, Atlanta, Ga., for the defendant.

SLOAN, District Judge.

By this action, brought under Section 222(b) of the Interstate Commerce Act, 49 U.S.C.A. § 322(b), The Interstate Commerce Commission, as plaintiff, seeks to have this Court enjoin the defendant from transporting or engaging in the transportation of dressed poultry by motor vehicle on public highways in interstate commerce for compensation, unless and until there is in force and effect with respect to the defendant either a certificate of public convenience and necessity as a common carrier, or a permit as a contract carrier.

The complaint alleges that the defendant is a corporation with its principal place of business at Jasper, Georgia, and is and has been engaged in such transportation of dressed poultry without either a certificate or a permit, in violation of Sections 206(a) and 209(a) of the Act, 49 U.S.C.A. §§ 306(a), 309(a), and will continue so to operate without authority unless enjoined by the Court. As specific instances of such transportation performed by the defendant the complaint lists 12 separate shipments of dressed poultry which it alleges the defendant transported from Jasper and Athens, Georgia, to Des Moines, Iowa, Chicago, Illinois and Detroit, Michigan, for compensation which averaged about $429 per shipment. Also listed for each shipment is the number of boxes it included of "D & D" (dressed and drawn) "fryers" (chickens), the weight (averaging almost 17,000 pounds per shipment), and the rate per pound the defendant charged and collected for the transportation.

The defendant's answer admits all the material allegations of the complaint except that it is or has been, or in the future will be, engaged in transporting property in interstate commerce for compensation in violation of the Act, or that its operations are subject to the provisions of the Act. As its first defense, it alleges that it has been "engaged in buying and selling dressed poultry, and that incident to such business it has leased trucks and transportation equipment from various lessors and delivers poultry by leased trucks to its customers."

The second defense is that the dressed poultry which the defendant "buys, sells and deals in is an exempt agricultural commodity" under Section 203(b) (6) of the Act, 49 U.S.C.A. § 303(b) (6).

The third defense is in essence the same as the first. The allegation is that "to the extent [the defendant] utilizes transportation facilities incident to its poultry business, it is a private carrier of property by motor vehicle within the meaning of" Section 203(a) (17) of the Act. 49 U.S. C.A. § 303(a) (17).

The case was submitted upon a stipulation of certain undisputed facts and upon the testimony of six witnesses in open court.

Findings of Fact.

The parties on January 2, 1953 filed in this Court stipulations, it being agreed that the facts so stipulated are true and may be considered by the Court without further proof of same, and such stipulations are made a part of the findings of fact in this case.

Leon P. Woodall first organized a corporation at Jasper, Georgia, to process poultry under the name of the Woodhill Feed Products Company, Inc., and conducted that business for some year or more, and while so operating it established a market for his products by finding out of State purchasers for the dressed poultry. After he had sold his interest in the Woodhill Feed Products Company of Jasper, Georgia, he removed to Athens, Georgia; organized the defendant corporation, Woodall Food Products Company, Inc., hereinafter referred to as "Woodall" and there made arrangements with Colonial Poultry Company, Inc., to sell him poultry to supply the needs of the customers that he had obtained, and while he was unable to secure a sufficient amount of poultry, he did obtain some from Colonial Poultry Company and they were originally billed to Woodall and Woodall in turn billed the out of State purchaser, made the collection, and then paid Colonial Poultry Company for the poultry.

Colonial was unable to furnish Woodall with a sufficient quantity of dressed poultry to satisfy the needs of Woodall's customers and he then made arrangements with Allied Egg and Poultry Company of Lawrenceville, Georgia and for a period of time took the entire output of that processing plant until Allied Egg and Poultry Company started making sales direct and again Woodall was not able to secure sufficient dressed poultry to supply the demands of his customers.

Woodall again approached Colonial Poultry Company at Athens, Georgia seeking to obtain additional dressed poultry and the obtaining of an additional dressing plant was discussed and the original dressing plant of Woodhill Feed Products Company at Jasper, Georgia was leased by Herbert Terry who has since operated the same under the name of Terry Poultry Company and has sold most of its output to Woodall.

When Woodall began to obtain from Terry Poultry Company at Jasper, Georgia about 100,000 chickens per week, which ran to a total volume of sixty to eighty thousand dollars per week, and from Colonial Poultry Company, Athens, Georgia about 35,000 chickens per week, the bank where Colonial Poultry Company did business suggested that there must be a change in the method of financing and it was at the bank's suggestion that the present plan of handling the sales to Woodall and the collections from Woodall was instituted, that is, that the processing plants, Colonial Poultry Company at Athens and Terry Poultry Company at Jasper would invoice the chickens to Woodall and he in turn would invoice them to the out of State purchaser, with instructions that the checks in payment for the poultry be made to Woodall but mailed to him care of Colonial Poultry Company, Athens, Georgia, or Terry Poultry Company, Jasper, Georgia, whichever company had sold the chickens to Woodall, and Woodall authorized one man at each of these processing plants to endorse the checks, collect same, retain the amount due for the shipment and remit the balance to Woodall. This arrangement was not a round robin hocus pocus nor a subterfuge, but was a bona fide agreement entered into to satisfy the banking requirements.

Woodall in conducting the business would receive telephone orders from his out of State customers for poultry and they would order the number and size of dressed chickens that they would require and it would then be necessary for Woodall to contact the processing plant, find out the number and weights of chickens that would be available to him and to again contact the out of State purchaser and communicate that information.

In order to obviate this delay and increased expense, Woodall arranged for his customers to contact the processing plants directly and place their orders there where they might determine at the time of the placing of the order the number and weight of dressed chickens available or obtainable and the processing plants would receive the order, invoice them to Woodall, who in turn would issue invoices to the out of State purchaser. This was a bona fide arrangement and not "a round robin hocus pocus," and was not an evasion or subterfuge, but was entered into for the purpose of streamlining the operation and to save time and expense.

The prices Woodall was to pay the processing plants and the prices that his out of State customers were to pay to Woodall was an agreed formula based upon the published price quotations issued by the United States Department of Agriculture daily. The mark-up in price from the processing plant to Woodall and from Woodall to his out of State customers at all times followed this formula.

Woodall's price to his out of State customers was a delivered price, and of course varied, depending upon the distance to be traveled in making the delivery.

Woodall owns the poultry which he transports, in leased trucks; has all of the credit risks, spoilage risks and risks of damage and loss of the cargo.

Woodall does not own, nor does he have any interest in transportation equipment, and has never held himself out to the public as a carrier.

The questions presented for determination are:

1. Whether the transportation operations of the defendant are those of a common or contract carrier, as contended by the plaintiff, or a private carrier, as contended by the defendant.

2. Whether dressed poultry of the type transported by the defendant is an exempted agricultural commodity within the meaning of Section 203(b)(6) of the Interstate Commerce Act.

### Conclusions of Law.

The defendant herein, Woodall Food Products, Inc., was, and is, neither a contract carrier by motor vehicle nor a common carrier by motor vehicle within the meaning of Section 203(a)(14) or Section 203(a)(15) of the Interstate Commerce Act, but, on the contrary, is a private carrier of property by motor vehicle within the meaning of Section 203(a)(17) of the Interstate Commerce Act.

As was said by Judge Waller in the case of Interstate Commerce Commission v. Tank Car Oil Corp., 5 Cir., 151 F.2d 834, 835, 837:

> "We think that Congress not only intended to say, but said, that if a person, in good faith, transports his own property for the purpose of sale or in furtherance of his own commercial enterprise he is a private carrier and, therefore, is not subject to the provisions of the Act."

Under the facts of this case, the defendant is not subject to the provisions of the Act for the reason that it did, in good faith, and does, transport its own property for the purpose of sale and in furtherance of its own commercial enterprise, and is a private carrier.

Since the defendant by reason of the nature of its operation is not covered by the Act, it is unnecessary to decide the second question presented as to whether dressed poultry of the type transported by the defendant is an exempt agricultural commodity within the meaning of Section 203(b)(6) of the Interstate Commerce Act.

A judgment in accordance with the foregoing findings of fact and conclusions of law may be prepared and presented.